The STATE ex rel. SCHMIDT

v.

SCHOOL EMPLOYEES RETIREMENT SYSTEM.

[Cite as *State ex rel. Schmidt v. School Emp. Retirement Sys.*, 150 Ohio App.3d 597, 2002-Ohio-6757.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 02AP–330.

Decided Dec. 10, 2002.

Stewart Jaffy & Associates Co., L.P.A., Stewart R. Jaffy, Marc J. Jaffy and Sue Fauber; and John L. Wolfe, for relator.

Betty D. Montgomery, Attorney General, and Judith T. Edwards, Assistant Attorney General, for respondent.

PEGGY BRYANT, Judge.

{¶ 1}  Relator, Douglas G. Schmidt, commenced this original action seeking a writ of mandamus that orders respondent, School Employees Retirement System ("SERS"), to vacate its decision denying his application for disability retirement benefits and to reconsider his appeal.

{¶ 2}  Pursuant to Civ.R. 53 and Section (M), Loc.R. 12 of the Tenth Appellate District, this matter was referred to a magistrate, who issued a decision, including findings of fact and conclusions of law.  (Attached as Appendix A.)  In the decision, the magistrate concluded that (1) SERS does not have to comply with the principles of *State ex rel Noll v. Indus. Comm.* (1991), 57 Ohio St.3d 203, 567 N.E.2d 245, (2) the board did not abdicate its responsibility by adopting the recommendation of its medical advisory board, (3) the report of Dr. Renneker that relator submitted on administrative appeal constitutes "additional objective medical evidence" as defined in Ohio Adm.Code 3309–1–41(A)(3), and SERS abused its discretion in finding that the report was not within that definition, and (4) absent the additional evidence, the evidence does not show that relator is

entitled to disability retirement. Given the magistrate's disposition of the third issue, the magistrate determined that the matter should be returned to SERS to give further consideration to relator's administrative appeal.

{¶ 3} Respondent SERS has filed objections to the magistrate's decision. In its first objection, SERS contends that Dr. Renneker's report is not additional objective medical evidence because the tests Dr. Renneker conducted were not objective in nature. Contrary to SERS's contention, the definition of "additional objective medical evidence" does not require that the tests performed be objective in nature. Rather, Ohio Adm.Code 3309–1–41(A)(3) defines "additional objective medical evidence" to be "current medical evidence documented by a licensed physician * * * [that] does not merely contain or reiterate findings of information contained in documents or evidence previously submitted." As the magistrate noted, the report of Dr. Renneker provides "postsurgical findings contrary to those of Dr. Dorfman and therefore presents findings not previously submitted to SERS." (Magistrate Decision, ¶ 85.)

{¶ 4} Respondent also contends the magistrate erred in requiring SERS to vacate its decision and further consider the appeal. As the magistrate properly explained, however, SERS's order indicates that it did not consider Dr. Renneker's report, as it states, "All of the information submitted on appeal for reconsideration of your disability retirement has been reviewed. Additional objective medical evidence in support of your application was not established." See Magistrate's Finding of Fact No. 14. Accordingly, even though SERS reviewed the report, it did not deem it additional objective medical evidence, and therefore did not consider it in relator's appeal. For the forgoing reasons, SERS's objections are overruled.

{¶ 5} Relator has filed objections to the magistrate's decision, rearguing the same four points that the magistrate adequately addressed in the decision. For the reasons set forth in the magistrate's decision, the objections are overruled.

{¶ 6} Following independent review pursuant to Civ.R. 53, we find that the magistrate has properly determined the pertinent facts and applied the salient law to them. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it. In accordance with the magistrate's determination, we issue a writ of mandamus ordering SERS to vacate its denial of benefits and to give further consideration to relator's administrative appeal.

Objections overruled
and writ granted.

BOWMAN and McCORMAC, JJ., concur.

JOHN W. MCCORMAC, J., retired, of the Tenth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.

## APPENDIX A

P.A. DAVIDSON, Magistrate.

{¶ 7} Relator, Douglas G. Schmidt, filed this original action asking the court to issue a writ of mandamus compelling respondent, the School Employees Retirement System ("SERS"), to vacate its decision denying his application for disability retirement benefits and to reconsider his appeal.

### Findings of Fact

{¶ 8} 1. Douglas G. Schmidt, relator herein, was employed by the Akron Public Schools. He ceased working after September 1999, and his last date of paid service was in January 2000.

{¶ 9} 2. In June 2000, relator filed an application for disability retirement benefits, supported by several medical reports:

{¶ 10} (a) Thomas Hoover, Ph.D., found relator disabled due to conversion disorder, anxiety, major depression, obsessive-compulsive traits, and pain disorder;

{¶ 11} (b) Richard Chase, D.O., found relator disabled due to conversion disorder, pain disorder, major depression, dysthymia, anxiety, and obsessive-compulsive traits;

{¶ 12} (c) An MRI of the cervical spine in February 2000 showed a mild disc bulge at C6–7 and a bulge at C5–6 that "slightly" flattened the ventral aspect of the cord. The spinal canal diameter was within normal but at the lower limits; and

{¶ 13} (d) In March 2000, James Beegan, M.D., provided a lengthy report regarding claimant's physical complaints. First, he described relator's medical history:

{¶ 14} "Mr. Schmidt is a 45–year–old, left handed man who presents of complaints of neck pain since 1992, right shoulder discomfort from an old rotator cuff tear status post surgical repair in October 1998, bilateral hand numbness and dysesthesias, left worse than right, left wrist pain, elbow discomfort particularly with pressure over the ulnar nerves bilaterally, loss of left hand coordination, intermittent bilateral lower limb numbness and pain, headaches, and pain in the small joints of his hands and feet and the large joints of the lower limbs, felt to be due to rheumatoid arthritis. MRI of the cervical spine 02/15/00 showed disk bulging at C5–6 and C7. Bone scan 01/25/89 showed increased activity in multiple small joints of the hands and feet, Dr. Bacha does diagnose rheumatoid arthritis.

He underwent nerve conduction studies approximately one year ago. The report from this study, done at Neurosurgery and Neurology Associates, Inc., stated that the patient had bilateral carpal tunnel syndrome. Actual values from the study are not reported, therefore this report is of no value for determining the severity of the condition at that time, nor for comparison to today's study to see if the conditions have worsened electrodiagnostically.

{¶ 15} "Mr. Schmidt recently underwent a trial of Vioxx for his widespread pain, this caused severe dyspepsia. Other non-steroidal anti-inflammatory drugs have been of limited benefit for him. He has also tried trigger point injections for his neck pain, and exercise and pain relief modalities without relief of symptoms. He has not had cervical spine or upper limb surgery, except for repair of right rotator cuff tear with good overall recovery.

{¶ 16} "Past Medical History:

{¶ 17} "1. Rheumatoid arthritis diagnosed by Dr. Bacha.

{¶ 18} "2. Lumbosacral degenerative disk disease with chronic low back pain.

{¶ 19} "3. Right rotator cuff tear, status post surgical repair in 1998 with good results.

{¶ 20} "4. Depression and anxiety disorder."

{¶ 21} Dr. Beegan then described his findings on examination:

{¶ 22} "Mr. Schmidt presents as an alert and cooperative, non-obese man who gave good effort with all aspects of strength testing. He exhibits normal strength in the bilateral upper limbs, he does have diminished coordination of his left hand. There is no muscle atrophy or fasciculations. Phalen's sign is positive for increased hand numbness bilaterally. He complains of dysesthesias in digits IV & V of both hands with palpation over the ulnar nerves at the elbow. Sensation is severely diminished in the left hand over digits I, II, & III, both to light touch and pinprick. Sensation is well maintained at pinprick over digits IV & V of the left hand and the entirety of the right hand. There is some diminishment of light touch sensation in the bilateral hands. Muscle stretch reflexes are 1+ at the bilateral elbows, trace at the bilateral brachioradialis. I did not check Spurling's maneuver based on the patient's history of chronic neck pain. There is no spasticity or upper motor neuron release signs."

{¶ 23} Dr. Beegan also performed electrodiagnostic studies, finding as follows:

{¶ 24} "1. Left median sensory and motor studies reveal significantly prolonged latencies at the wrists, consistent with at least moderate severity carpal tunnel syndrome.

{¶ 25} "2. Left ulnar motor studies reveal slowing of the ulnar motor conduction around the elbow, consistent with ulnar neuropathy at the elbow, at least mild severity.

{¶ 26} "3. Right median sensory studies show prolongation at the wrist, consistent with carpal tunnel syndrome of at least mild severity. Right median motor studies are normal at the wrist and through the forearm.

{¶ 27} "4. Right ulnar motor studies are normal.

{¶ 28} "5. Needle electromyography of the left upper limb reveals evidence of axon loss in the abductor pollicis brevis muscle, as well as decreased total interference pattern with maximal contraction of this muscle. The remainder of left upper limb needle electromyography was normal."

{¶ 29} Dr. Beegan stated the following findings and conclusions:

{¶ 30} "1. Left carpal tunnel syndrome, mild to moderate severity, with evidence of ongoing axon loss.

{¶ 31} "2. Mild left ulnar neuropathy at the elbow.

{¶ 32} "3. Right carpal tunnel syndrome, mild severity, without evidence of axon loss.

{¶ 33} "4. No evidence of right ulnar neuropathy.

{¶ 34} "5. No evidence of cervical radiculopathy bilaterally.

{¶ 35} "RECOMMENDATIONS:

{¶ 36} "1. He should undergo surgical release for the left carpal tunnel syndrome as soon as possible, particularly based on the progression of his symptoms and the objective evidence of axon loss in the abductor pollicis brevis muscle.

{¶ 37} "2. The left ulnar neuropathy and right carpal tunnel syndrome should be managed conservatively, in my opinion, with activity restriction, bracing as needed, and repeat electrodiagnostic studies in one year or so if symptoms persist or worsen.

{¶ 38} "3. We have arranged for consultation with Dr. Biondi of Hand Surgery in regard to the above condition. Mr. Schmidt will follow-up with me * * *."

{¶ 39} 3. In a form report on April 19, 2000, Dr. Beegan stated that claimant had been disabled from performing his duties as a school employee since May 1998 due to cervical sprain/strain, bilateral carpal tunnel syndrome, and right rotator cuff tear. When asked what tests had been performed to support the diagnosis, Dr. Beegan listed the MRI of February 2000 and the electrodiagnostic studies of March 2000.

{¶ 40}   4. In September 2000, relator was examined on behalf of SERS by Daniel Dorfman, M.D., an orthopedic specialist, who indicated at the outset that he was aware of the applicant's usual employment:

{¶ 41}   "Mr. Schmidt is a 46–year–old gentleman who has been employed as a carpenter * * *.  He notes he is responsible for performing skilled work in construction repair of structures or educational equipment, performs construction and alteration or repair of floors, rough stairways, partitioned doors, windows, fixtures, furniture, and drywall and assists in installing and repairing floor tiles and ceiling tiles, performs multiple masonry tasks, and does require the operation of a variety of power equipment.  He notes his job requires repetitive lifting, stooping, bending, walking, climbing, overhead reaching and lifting, as well as ladder use."

{¶ 42}   Dr. Dorfman reviewed claimant's history of medical treatment at length, noting that claimant had a left carpal tunnel release and ulnar nerve transposition in July 2000 "and faired well with this," and that injections were given for the right carpal tunnel and right epidondylitis "with good benefit."  In regard to objective testing, Dr. Dorfman reported:

{¶ 43}   "Review of prior diagnostic test reports show EMG nerve conduction study of 3/24/00 revealing mild left carpal tunnel syndrome and left ulnar neuropathy at the elbow, mild right carpal tunnel syndrome, and no evidence of cervical radiculopathy.  MRI report of the cervical spine from 2/25/00 states 'the overall spinal canal diameter is on the lower limits of normal from C3–4 through C6–7. Disc bulge at C5–6 abuts and slightly flattens the ventral aspect of the cord.  C7 disc bulge.'  Electrodiagnostic study of 7/21/94 shows 'nerve conduction study of the upper extremities and of the lower extremities show abnormalities consistent with bilateral carpal tunnel syndrome.  There was no evidence for an underlying polyneuropathy.'  A CT scan of the head from 7/21/94 report shows 'normal unenhanced and enhanced coracoclavicular distance compared to the left shoulder suggesting acute or chronic AC separation (probably grade II or grade III).  There is an old fracture of the left clavicle with deformity.  The shoulders are otherwise normal.'  A bone scan of 6/30/94 shows 'fracture of the midshaft left clavicle of uncertain age.  Increased tracer uptake of a moderate degree in the lateral mallleoli of both ankles, consistent with arthritis or stress reactions.  Otherwise normal bone and joint scan including the cervical and lumbar vertebral regions of interest.'  CT scan of the cervical spine of 11/3/93 report shows 'negative except for degenerative arthritis C7–T1 facet joint right hand side.'  Magnetic resonance imaging may be helpful for further evaluation.'  MRI of the cervical spine of 11/9/93 shows 'normal MRI cervical spine.'

{¶ 44} "X-rays of the cervical and lumbar spine were obtained today as no studies were available for direct review. Cervical spine films shows slight degenerative change at the C4 through T1 levels without dramatic disc space narrowing and no evidence of significant foraminal stenosis bilaterally. Normal lordosis is otherwise maintained. X-rays of the lumbar region obtained today do reveal disc space narrowing at the L4–S1 level with no other substantial bony abnormalities appreciated."

{¶ 45} On physical examination, Dr. Dorfman observed:

{¶ 46} "On examination, Mr. Schmidt is a 46–year–old, fit appearing gentleman ambulating into the examination room with a symmetrical nonantalgic gait pattern. He is afebrile, is 5'8" tall, weighs 165 1/2 pounds, has a blood pressure of 128/74, and a pulse of 64 and regular. He has level pelvis and shoulder girdle on relaxed standing. There is slight flattening of cervical lordosis. He has full cervical flexion, lack of 10 full extension, rotation of 40 bilaterally, and lateral flexion of 35 bilaterally. Spurling sign is negative midpoint of the upper trapezius, and has no focal trigger points over the medical scapular border bilaterally. Mr. Schmidt has tenderness to palpation over the suboccipital triangle bilaterally and over the medial scapular border range of shoulder motion bilaterally with negative drop arm test and negative impingement signs. Speed sign and Yergason's test are negative. There is full motor power on manual muscle testing in the upper extremities bilaterally with the exception of slight give way weakness on right hand grip strength testing. This is despite the fact that individual strength testing of the FDS and FDP muscles is entirely intact. There is slight atrophy over the FDI on the right when compared to the left. There is no objective sensory deficit to light touch in a peripheral nerve or dermatomal distribution in the upper extremities bilaterally. There is a well-healed carpal tunnel scar and ulnar transposition scars over the left wrist and elbow respectively. Tinel's sign is negative over a median and ulnar distribution at the wrist bilaterally and over the ulnar distribution at the elbows bilaterally. Mr. Schmidt has significant callus appearance of all digits and palm bilaterally which is incongruous to his reported diminished activity level since October 1999.

{¶ 47} "Reflexes are 2/4 and symmetrical at the biceps, triceps, and brachioradialis bilaterally. Hoover sign is negative bilaterally.

{¶ 48} "Lumbar musculature is slightly tender to palpation without focal trigger points over the lumbosacral junction, sciatic-notch, SI joint, piriformis, or trochanteric bursa. Mr. Schmidt is able to forward flex to 4.5 cm to modified Schober test and extend to 15 beyond neutral again with mild discomfort at end range. He is able to toe rise and heel rise on each leg independently and can assume a full squat and rise from this independently. There is full motor power

in all lower extremity groups bilaterally. Reflexes are 2/4 and symmetrical at the knees and ankles with down going toes and no clonus. Seated and supine straight leg raises are unremarkable to 85°."

{¶ 49} Dr. Dorfman stated the following diagnoses and conclusions:

{¶ 50} "1. Mild cervical spondylosis.

{¶ 51} "2. Mild lumbar degenerative disc disease.

{¶ 52} "3. Status post right shoulder arthroscopic decompression without evidence of ongoing impingement or rotator cuff dysfunction.

{¶ 53} "4. Status post left carpal tunnel release and left ulnar nerve transposition.

{¶ 54} "IMPRESSION: Mr. Schmidt is a 46–year–old gentleman with diffuse musculoskeletal complaints with limited objective abnormality appreciated on examination. He does have mild spondylitic changes in the cervical and lumbar region without objective neurologic deficit on examination. He has resolution of right rotator cuff dysfunction following successful arthroscopic decompression in October 1998 and has had resolution of the carpal tunnel on the left following a carpal tunnel release and resolution of ulnar nerve transposition. He has mild carpal tunnel syndrome on the right with limited objective abnormality on examination and has pain complaints which clearly exceed the physical findings on examination.

{¶ 55} "RECOMMENDATIONS:

{¶ 56} "1. Based on the history and physical examination obtained today, and review of the prior diagnostic testing, I believe that Mr. Schmidt is capable of performing his current occupational duties due solely from a musculoskeletal standpoint.

{¶ 57} "2. I believe Mr. Schmidt is not physically incapacitated for a period of at least 12 months, and is able to perform his occupational duties for which he was responsible as a school employee.

{¶ 58} "3. I believe that Mr. Schmidt's physical complaints clearly exceed the findings on examination and defer to his psychologist regarding his psychological condition to assess whether in fact his psychological/psychiatric status precludes his ability to perform his occupational duties."

{¶ 59} 5. Relator was also examined on behalf of SERS in September 2000 by Jeffrey Hutzler, M.D., a psychiatrist. Dr. Hutzler noted that relator had begun taking antidepressant medication in July 2000 and said that "they've been very helpful" and that "I'm okay now." Dr. Hutzler diagnosed "psychological factors affecting a physical illness (neck pain)" and an obsessive/compulsive personality

type but found that relator was receiving excellent psychiatric treatment and was not incapacitated in his ability to work.

{¶ 60} 6. Next, the SERS medical advisory committee reviewed the file. George Lohrman, M.D., noted his review of reports from treating physicians and independent examiners. He recited parts of the independent reports and concluded that disability retirement should not be granted at that time.

{¶ 61} 7. Charles Wooley, M.D., also reviewed the file for SERS. In his report, Dr. Wooley summarized the findings of the independent examiners and noted the dates of the attending physicians' reports. He concluded that relator was not permanently incapacitated from performing his usual duties as a carpenter.

{¶ 62} 8. Timothy Fallon, M.D., also reviewed the file, noting the application, job duty form, job description, MRI, Dr. Beegan's report, Dr. Hoover's report, and the reports of the independent examiners. Dr. Fallon opined that relator was not incapacitated from continuing work as a carpenter and should not be placed on disability benefits.

{¶ 63} 9. On November 15, 2000, Edwin Season, M.D., the chair of the committee, notified the SERS retirement board that, based on the findings of the independent examiners, the committee found that the applicant was not disabled.

{¶ 64} 10. On November 21, SERS advised relator that, on November 20, 2000, the board agreed with the committee's recommendation and disapproved the application.

{¶ 65} 11. On November 24, 2000, relator filed an appeal, stating that he would provide additional medical evidence.

{¶ 66} 12. Relator filed a psychological assessment from Melessa Hunt, Ph.D. He also filed a report from Nancy Renneker, M.D., who stated these findings on examination:

{¶ 67} "Height: 5'8", Weight: 170 lbs. Gait on level surfaces is within normal limits. Active neck range of motion: flexion 30 degrees, extension 20 degrees, bilateral neck rotation 30 degrees and bilateral neck lateral flexion 15 degrees with paravertebral muscle spasm noted on active neck range of motion. Skin exam of bilateral upper extremities is remarkable for: (a) two well healed arthroscopic scars are noted at right shoulder (b) a well healed 12cm. In length surgical scar is noted medial aspect of left elbow (3) a well healed horizontal surgical scar is noted volar aspect of left wrist (d) Tinel's sign is noted medial aspect of bilateral elbows and volar aspect of bilateral wrists and (e) left first dorsal web space-first dorsal interossei atrophy is noted. Active right shoulder range of motion: flexion 150 degrees, extension 40 degrees, abduction 110

degrees, adduction 20 degrees, external rotation 50 degrees and internal rotation 30 degrees. Active right wrist range of motion: extension 60 degrees, flexion 60 degrees, ulnar deviation 30 degrees, supination 60 degrees and pronation 70 degrees, flexion 60 degrees, ulnar deviation 30 degrees and radial deviation 20 degrees. Active left elbow range of motion: 30–140 degrees, supination 60 degrees and pronation 70 degrees. Active left wrist range of motion: extension 60 degrees, flexion 50 degrees, radial deviation 20 degrees and ulnar deviation 30 degrees. Bilateral upper extremity strength, deep tendon reflexes and sensation are within normal limits with the exception of: (1) decreased sensation in right C7 dermatome (2) decreased sensation in median nerve distribution of bilateral hands (3) decreased sensation in left ulnar forearm and left ulnar hand (4) 4/5 strength is noted in left thumb and left 5th finger opposition, left thumb adduction and left finger abduction-adduction (5) 4/5 right thumb opposition strength (6) 3+/5 strength is noted in right extensor indices (7) decreased right grip strength with increased strength loss index. Normal right (non-dominant hand) grip strength in a 46 year old male equals 47 kg., Douglas Schmidt's right grip strength equals 25 kg. And corresponds to a 47% strength loss index and (8) decreased left grip strength with increased strength loss index. Normal left (dominant hand) grip strength in a 46 year old male equals 49 kg., Douglas Schmidt's left grip strength equals 21 kg. And corresponds to a 57% strength loss index."

{¶ 68} Dr. Renneker listed work restrictions including no overhead work, no reaching above horizontal with the right arm, no climbing ladders, no crawling or working on all fours, no pushing or pulling with either arm, no repetitive use of the hands, no lifting of more than 8 pounds with one arm and no lifting of over 15 pounds with both arms. Based on these restrictions, she found relator unable to work as a school carpenter.

{¶ 69} 13. In February 2001, Dr. Season reported to the retirement board as follows: "Information submitted on appeal was reviewed. The submissions do not constitute additional objective evidence as defined in Ohio Administrative Rule 3309-1-41. Based upon review of the entire file, including the submissions on appeal, the Medical Advisory Committee sees no basis to change the original decision to deny disability retirement and recommends that the appeal be denied."

{¶ 70} 14. In March, SERS advised relator of the retirement board's decision: "All of the information submitted on appeal for reconsideration of your disability retirement has been reviewed. Additional objective medical evidence in support of your application was not established. On March 15, 2001, the Retirement Board upheld their original decision to deny your disability retirement application. All appeal rights in regard to this application have ceased."

Conclusions of Law

{¶ 71} The issue before this court is whether relator has met his burden of proving an abuse of discretion by SERS. Relator presents the following arguments: (1) that SERS must comply with the principles in *State ex rel. Noll v. Indus. Comm.* (1991), 57 Ohio St.3d 203, 567 N.E.2d 245, and failed to do so; (2) that the board abdicates its responsibility by merely adopting the recommendation of its medical advisory board; (3) that the reports submitted by relator on administrative appeal constituted "additional objective medical evidence" as defined at Ohio Adm.Code 3309–1–41(A)(3) and that SERS abused its discretion in finding that the reports were not within the definition; and (4) that the evidence demonstrated that relator was unable to perform his usual duties.

{¶ 72} The first argument, regarding *Noll,* lacks merit. See *State ex rel. Copeland v. School Emp. Retirement Sys.* (Aug.5, 1999), Franklin App. No. 98AP–1173, 1999 WL 569279, appeal dismissed (2000), 88 Ohio St.3d 1507, 728 N.E.2d 1; see, also, *State ex rel. Pipoly v. STRS* (2002), 95 Ohio St.3d 327, 2002-Ohio-2219, 767 N.E.2d 719. In *Noll,* supra, the Ohio Supreme Court stated: "* * * Surely it is not unreasonable, overburdensome or onerous to require the commission to set forth an explanation of how each of the *Stephenson* factors has been considered and why the applied factors, coupled with the medical impairment evidence, still do not entitle an injured claimant to permanent total disability." Id., 57 Ohio St.3d at 210, 567 N.E.2d 245. However, the Industrial Commission's task in determining permanent total disability ("PTD") is very different from SERS's task in determining disability retirement.

{¶ 73} The issue before SERS is narrow: whether the applicant is medically capable of returning to his former duties. In contrast, the issue before the Industrial Commission is often far more complex: in cases where the worker is medically unable to return to his former duties, the commission must then determine the worker's residual medical capacity for some other type of work, and, after that, it must evaluate and weigh vocational factors. *State ex rel. Stephenson v. Indus. Comm.* (1987), 31 Ohio St.3d 167, 31 OBR 369, 509 N.E.2d 946.

{¶ 74} Thus, in a disputed PTD matter, the difficult, multifactored determination is whether the claimant could perform some *other* type of work, different from his former duties, based on residual medical capacity and vocational considerations. Id.; *State ex rel. Speelman v. Indus. Comm.* (1992), 73 Ohio App.3d 757, 598 N.E.2d 192. In contrast, the threshold issue in a PTD hearing— whether the claimant is medically capable of returning to the former position of employment—is essentially a question of medical capacity, and its resolution is

comparatively simpler in that the commission decides which medical opinions were more persuasive. See, e.g., *Speelman*, supra.

{¶ 75} In an SERS determination of disability retirement, however, the *only* question is whether the applicant can return to his former duties. SERS need not determine the applicant's residual medical capacity for other types of work, nor does it evaluate the applicant's education, work history, existing skills, trainability, vocational efforts, age, etc., in regard to ability to do some other kind of work. The entire issue before the SERS retirement board is whether the applicant is medically capable of returning to the former duties, which is merely the threshold stage of a PTD determination. Where the SERS board has adopted the recommendation of the medical advisory committee, the committee reports delineate which medical opinions were relied upon, thus revealing the basis of the determination. In sum, due to the material differences between the disability determinations made by the Industrial Commission and SERS, it is not necessary or proper to impose all the requirements of *Noll* upon SERS.

{¶ 76} Relator's second contention is that the retirement board abdicated its responsibility by adopting the recommendation of its medical advisory committee. The magistrate disagrees. Because the retirement board is composed of SERS members such as school bus drivers, cooks, etc., their reliance on medical reports is essential. Similarly, their reliance on a committee of physicians who have reviewed all the medical reports—from both treating and consulting physicians—is reasonable. The record includes no evidence that the retirement board gave an unconsidered "rubber-stamp" approval to the committee's recommendation or otherwise failed to give reasonable consideration to relator's application.

{¶ 77} The magistrate next addresses the fourth argument that the evidence conclusively proved that relator was entitled to a disability retirement. The magistrate cannot agree. Although Drs. Beegan and Hoover opined that relator was unable to perform his usual job, other doctors disagreed. Neither Dr. Dorfman nor Dr. Hutzler set forth findings or restrictions that are patently inconsistent with the job duties. The record indicates that the independent examiners and the advisory committee members were aware of relator's job duties, and all of them concluded that the applicant was not incapacitated from performing his usual duties.

{¶ 78} Last, relator argues that SERS abused its discretion in concluding that the two reports he submitted on appeal did not constitute "additional objective medical evidence," as defined in the Administrative Code. The magistrate agrees insofar as the report of Dr. Renneker is concerned.

{¶ 79} Ohio Adm.Code 3309–1–41(A)(3) provides the following definition: "For purposes of this rule, 'additional objective medical evidence' means [1] current medical evidence [2] documented by a licensed physician [3] specially trained in the field of medicine pertinent to the illness or injury; for which disability is claimed, and [4] such evidence itself has not, heretofore, been submitted, and [5] such evidence does not merely contain or reiterate findings of information contained in documents or evidence previously submitted. All medical evidence submitted shall be reviewed by a member of the medical advisory committee who shall advise as to its status as 'additional objective medical evidence.' "[1]

{¶ 80} Under the above-quoted definition, it is clear that the report of Dr. Hunt did not qualify as "additional objective medical evidence." The parties agree that Dr. Hunt, a psychologist, was not a licensed physician.

{¶ 81} As to Dr. Renneker's report, SERS does not dispute that it was current, nor does it contend that Dr. Renneker was not a physician in the appropriate specialty. Likewise, SERS acknowledges that her report was not submitted prior to the appeal. Rather, SERS argues that the Renneker report did not meet the final requirement: that the "evidence does not merely contain or reiterate findings of information contained in documents or evidence previously submitted."

{¶ 82} To determine whether Dr. Renneker's report contained findings that had already been submitted to SERS, the court compares her report to the orthopedist/physiatrist reports in the file prior to the appeal. E.g., *Copeland*, supra, at fn. 1. Thus, in this case, the court compares her report to the reports of Dr. Beegan and Dr. Dorfman.

{¶ 83} At oral argument, relator explained that Dr. Renneker's report, up to the heading "Examination" on page 8, is merely a review of background information. Thus, the portions of her report at issue are those following that heading.

{¶ 84} At first glance, it may appear that Dr. Renneker did not provide new findings or information, in that Dr. Beegan had already indicated deficits in the same areas observed by Dr. Renneker, who merely provided more detail in certain areas. See *Copeland*, supra. Nonetheless, the magistrate finds that there was one subject on which Dr. Renneker provided findings different from those in the reports of Drs. Beegan and Dorfman.

---

1. As published, this code section contains the phrase "findings of information," but in *Copeland* this court interpreted the text as "findings or information." The magistrate agrees that the word "or" makes more sense and that the word "of" appears to be a typography error. Nonetheless, in the present action, the conclusions are the same under both readings of the definition.

{¶ 85} Although Dr. Beegan had already observed deficits similar to those found by Dr. Renneker, Dr. Beegan's examination was done prior to the surgery and treatments described in Dr. Dorfman's report. Dr. Dorfman indicated that the surgical and other treatments were successful and that he found no neurological deficit. However, Dr. Renneker made contrary findings regarding the applicant's postsurgical condition, noting, for example, lack of sensation in certain areas. Thus, her report provides postsurgical findings contrary to those of Dr. Dorfman and therefore presents findings not previously submitted to SERS. Accordingly, the SERS conclusion that Dr. Renneker's report did not constitute additional objective medical evidence, as defined, appears to be an abuse of discretion because no basis for the conclusion is evident on the face of the record.

{¶ 86} In sum, the magistrate has reviewed the medical reports of Drs. Beegan and Dorfman, as compared and contrasted with Dr. Renneker's report, and has not found a basis for concluding that Dr. Renneker's report presented findings submitted previously to SERS. In other words, because a search of the record has revealed no basis for concluding that the Renneker report was not "additional objective medical evidence," that conclusion by SERS was an abuse of discretion.

{¶ 87} The magistrate, however, makes no finding that SERS was or is required to explain the basis for its evidentiary determinations. Rather, the conclusion here is only that where the court's review does not reveal the basis for the determination, the court may find an abuse of discretion.

{¶ 88} The magistrate notes the argument by SERS that even if Dr. Renneker's report did meet the threshold standard in the definition, the result will not be affected because the standard affected only the right to a personal appearance, something relator never requested. However, the magistrate is not persuaded that the error was harmless.

{¶ 89} When the chair of the medical advisory committee advises the board that new evidence on appeal does not constitute "additional objective medical evidence," the board may well discount that evidence, giving it little or no weight based on that categorization. Indeed, given the technical/medical nature of the advice provided by the medical advisory committee, it is likely that the board of laypersons would frequently rely on the committee's opinion regarding the status of medical evidence.

{¶ 90} The magistrate concludes that the matter must be returned to SERS to vacate its denial of benefits and to give further consideration to the administrative appeal. In reaching this conclusion, the magistrate acknowledges that, even if the report meets the definition of "additional objective medical evidence," that

does not mean that SERS has a duty to accept its contents, adopt its findings, or find it persuasive in view of the other medical reports before it.